IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

DECEMBER 1996 SESSION


FILED

April 20, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9507-CR-00189 |
| | ) | |
| | ) | Shelby County |
| v. | ) | |
| | ) | Honorable Chris Craft, Judge |
| | ) | |
| ROSCOE L. GRAHAM and | ) | (Graham--Attempt to commit voluntary |
| KENDRICK L. CAVIL, | ) | manslaughter; Cavil--attempt to commit |
| | ) | second degree murder) |
| Appellants. | ) | |

For Appellant Graham:

Leslie I. Ballin
200 Jefferson Avenue
Suite 1250
Memphis, TN 38103

For Appellant Cavil:

A.C. Wharton, Jr.
District Public Defender
201 Poplar Avenue
Memphis, TN 38103
(AT TRIAL)

Randall B. Tolley
242 Poplar Avenue
Memphis, TN 38103
(ON APPEAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Clinton J. Morgan
Assistant Attorney General of Tennessee
425 Fifth Avenue North
Nashville, TN 37243-0493

John W. Pierotti
District Attorney General
        and
Kevin Rardin
Assistant District Attorney General
201 Poplar Avenue
Memphis, TN 38103-1947

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

## O P I N I O N

The defendants, Roscoe L. Graham and Kendrick Cavil, appeal as of right from their convictions in a jury trial in the Shelby County Criminal Court. Cavil was convicted of attempt to commit second degree murder, a Class B felony, and sentenced as a Range I, standard offender to nine years in the custody of the Department of Correction and fined one thousand five hundred dollars. Graham was convicted of attempt to commit voluntary manslaughter, a Class D felony, and sentenced as a Range I, standard offender to three years in the workhouse and fined one thousand dollars. Graham was placed on immediate probation for three years. The following issues, applicable to both defendants, were presented for our review:

> (1) whether the evidence is insufficient to support the defendants' convictions;
>
> (2) whether the trial court erred in allowing the victim's mother to testify regarding the victim's condition;
>
> (3) whether the trial court erred in allowing the state to introduce mug-shot photographs that were used to identify the defendants;
>
> (4) whether the trial court erred in limiting the cross-examination of a witness, George Petties;
>
> (5) whether the trial court erred in excluding impeachment evidence of a prior conviction for attempt to commit a misdemeanor;
>
> (6) whether the trial court properly charged the jury on the burden of proof;
>
> (7) whether the trial court erred in not charging the jury regarding assault and aggravated assault as lesser included offenses; and
>
> (8) whether the trial court erred in not charging the jury with regard to the ranges of punishment applicable to all the offenses charged.

Defendant Cavil presents the additional issue of whether the trial court imposed an excessive sentence by improperly balancing the enhancement and

2

mitigating factors. We affirm the trial court's judgments of conviction for both defendants.

The defendants were tried for the attempt to commit first degree murder of Darrel Wayne Franklin on April 14, 1994. George Petties testified that he and K.C. Parks were with the victim in the front yard of Arthur Graham's house. Arthur Graham is the uncle of the defendant, Roscoe Graham. Petties testified that he knew Graham. He stated that he did not know Cavil by name, but only as Cap.

Petties testified that he saw the defendants come out of the house. He said Cavil walked down the steps, and Graham walked down the handicapped access ramp in front of the house. Petties said Cavil walked up to Franklin and chopped Franklin in the neck with his hand. Petties testified that after the first blow, which stunned Franklin, Graham started beating Franklin. He said both Cavil and Graham hit Franklin with their fists until Franklin collapsed to the ground, apparently unconscious and bleeding. Petties stated that Graham kicked Franklin in the head and side a few times and then Cavil started stomping Franklin. He said that Cavil grabbed the railing of the handicapped access ramp, jumped on Franklin as he was lying on the ramp, and landed on Franklin's head with both feet. Petties testified that he saw Cavil do this about ten times.

Petties testified that while Cavil was stomping Franklin's head, he saw Graham standing next to Parks with his hand on the grip of a pistol that he was wearing at his waist. Petties said that Cavil and Graham then got into their car and drove away, leaving Franklin lying on the ground, bleeding and unconscious.

K.C. Parks testified that he was visiting Petties and Franklin when Cavil and Graham came out of the house. He testified that he knew Graham and that he

3

knew Cavil only as Cap. Parks stated that Cavil hit and stunned Franklin, Graham punched Franklin, and then Cavil hit Franklin again before Franklin fell to the ground. Parks testified that Graham then kicked Franklin with the side of his foot, and Cavil jumped on Franklin's face while he was on the ground. Parks testified that he told Cavil to leave Franklin alone. He said that the defendants then left.

The victim testified that he was talking to Petties and Parks when the defendants walked out of the house. He stated that Cavil walked up to him and hit him in the neck. He said that Graham hit him, and then Cavil hit him again. He remembered that after he fell to the ground, Graham kicked him several times. He did not remember anything else until he awoke in the hospital. He testified that he was in the hospital for thirty-five days, but he did not know what the doctors did to him while he was there. He stated that he has trouble remembering things.

The victim's mother, Kay Monger, testified that after she was notified that her son was injured, she went to Arthur Graham's house and saw her son being treated by paramedics. She said that she went to the hospital with him. She stated that he was in a coma for sixteen days and that when he first came out of the coma, he could only babble. She testified that her son received occupational, physical, and speech therapy. She testified that before the beating, Franklin was enrolled in a community college. She said that after he was released from the hospital, he did not walk or talk the same, and he was no longer able to work as a car mechanic.

Defendant Graham testified that he and Cavil went to his uncle's house. Graham said that after they arrived, he went inside to use the bathroom. Graham stated that as he was leaving the house, he saw Cavil being attacked by Petties and Franklin. Graham said he went to Cavil's defense and tried to break up the fight.

4

Graham testified that he and Cavil made their way to the car and left. Graham testified that he owns a gun but that he did not have it with him that day.

Defendant Cavil testified that he worked for Graham's security company and had to fill in for another employee. He said that Graham was driving him to his sister's house in order for him to get a uniform. Cavil said that when Graham stopped at his uncle's house to use the bathroom, Cavil stayed outside. He testified that Petties and Franklin approached him. He said that Petties was behind him and Franklin was in front of him. He said that Franklin grabbed the front of his shirt, and Petties hit him from behind. Cavil testified that he was fighting back when Graham came out of the house and came to his aid.

## I. SUFFICIENCY OF THE EVIDENCE

Defendant Cavil contends that the evidence is not sufficient to support his conviction for attempt to commit second degree murder. He asserts that the defendants' testimony shows that he was provoked into a state of passion sufficient to show an attempt to commit voluntary manslaughter and that Graham's conviction of attempt to commit voluntary manslaughter shows that Cavil could not be convicted of a greater offense. The state responds that the evidence is sufficient. We agree.

Defendant Graham contends that the evidence is not sufficient to support his conviction for attempt to commit voluntary manslaughter. He asserts that the evidence does not show that he was provoked or in a state of passion or that he had the intent to kill. Graham argues that the state's evidence indicates that he was not provoked and that he was "plain and cool." He also argues that he did not have the requisite intent because the state's evidence indicates that he told Cavil to stop jumping on Franklin's head and because his conduct, while sufficient to show assault, was not sufficient to show an intent to kill. The state responds that mutual combat may be

5

sufficient provocation to support a voluntary manslaughter conviction, and the defendant's testimony indicates both provocation and passion. Additionally, the state asserts that the evidence is sufficient to support a conviction for attempt to commit either first or second degree murder, thus the lesser included offense of attempt to commit voluntary manslaughter should stand.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we may not reweigh the evidence but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Under this standard, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from it. Cabbage, 571 S.W.2d at 835. That is, the testimony favoring the state is accredited, and all conflicts are resolved in favor of the state's theory. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

### A. Defendant Cavil

Defendant Cavil was found guilty of attempt to commit second degree murder. To be guilty of criminal attempt, the defendant must have acted with the kind of culpability necessary for second degree murder. See T.C.A. § 39-12-101. Second degree murder is defined as the "knowing killing of another." T.C.A. § 39-13-210. A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

6

In addition to the requisite mental state for second degree murder, the defendant must also act "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be," and the conduct must constitute a substantial step toward the commission of the offense. T.C.A. § 39-12-101(a)(3).

A rational trier of fact could reasonably conclude that Cavil knowingly attempted to kill the victim and acted with the intent to complete the killing. The evidence shows that after Cavil beat the victim until he fell to the ground, apparently rendering the victim unconscious, Cavil repeatedly jumped on the victim's head. Further proof shows that after the beating, the victim was in a coma for sixteen days. The trial court noted that the victim suffered extremely great personal injury.

Defendant Cavil argues that he could not be convicted of a greater offense than Graham, who was convicted of attempt to commit voluntary manslaughter. The evidence shows that Cavil's attack on the victim was more intense than Graham's attack. The evidence shows that although Graham kicked the victim after he fell to the ground, Cavil repeatedly jumped on the victim's head. A rational trier of fact could reasonably conclude that Cavil acted with greater culpability than Graham and that Cavil's actions warranted a conviction for attempt to commit second degree murder.

Verdicts need not be consistent between codefendants as long as the evidence sufficiently supports the verdicts. In State v. Gennoe, 851 S.W.2d 833 (Tenn. Crim. App. 1992), the defendants picked up a college student as she was walking along the road, drove her to a deserted area, and attempted to have sex with her. Id. at 833-35. One defendant in Gennoe contended that his conviction for facilitation of sexual battery was inconsistent with his codefendant's conviction. Id. at 835. This court held that "[i]nconsistent jury verdicts are not fatal to a conviction." Id.; see also, State v.

7

Lewis, 919 S.W.2d 62, 67 (Tenn. Crim. App. 1995) (holding that a codefendant's acquittal did not result in fundamental unfairness); State v. Stapleton, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982) (holding that a conviction for aiding and abetting will stand regardless of whether the principal has been convicted). We conclude that the evidence is sufficient.

### B. Defendant Graham

Defendant Graham was convicted of attempt to commit voluntary manslaughter. To be guilty of criminal attempt, a person must act with the kind of culpability necessary for voluntary manslaughter. See T.C.A. § 39-12-101. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). One acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

In addition to the requisite mens rea, the defendant must also act in a manner outlined in our criminal attempt statute. See T.C.A. § 39-12-101(a)(1)-(3). One means by which an attempt to commit voluntary manslaughter may occur is if a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3).

A rational trier of fact could reasonably conclude that Graham intentionally or knowingly attempted to kill the victim. The evidence shows that the defendant struck

the victim after Cavil struck the victim. Graham first hit the victim with his fists, and then kicked him while he was on the ground.

Also, a rational trier of fact could reasonably conclude that Graham attempted to kill the victim in a "state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a). The evidence shows that of the two defendants, Cavil was the first to strike the victim. Graham testified that he believed that the victim started the fight and that he voluntarily joined in the fray.

In viewing the testimony in the light most favorable to the state, we believe that the jury could reasonably conclude that Graham, seeing his companion engaged in a fight, was sufficiently provoked and acted in an irrational manner. We conclude that the evidence supports the jury's finding that the defendant was guilty of attempt to commit voluntary manslaughter beyond a reasonable doubt. See, e.g., Hunt v. State, 303 S.W.2d 740, 742 (Tenn. 1957) (holding that the evidence supported a voluntary manslaughter conviction when death resulted from mutual combat).

## II.  VICTIM'S MOTHER'S TESTIMONY

Both defendants contend that the testimony of the victim's mother regarding her son's condition was inadmissible. They argue that the mother was not an expert qualified to testify about her son's medical condition, the testimony was not relevant, and the testimony was unduly prejudicial. The state responds that the mother's testimony was admissible because she testified only to what she observed about her son's condition, that the testimony was relevant to show intent, and that the testimony was not unfairly prejudicial. We agree.

9

Before trial, the defendants sought to prevent the victim's mother from testifying about the victim's medical condition. The defendants contended that it would be impermissible to allow testimony of the victim's condition before and after the beating without also having expert testimony showing a causal connection between the change in the victim's condition and the beating. The defendants argued that without this causal link, a leap of faith is required to attribute changes in the victim's condition to the beating. Additionally, the defendants argued that the victim's condition was not relevant to the offenses and was highly prejudicial.

The trial court ruled that testimony about the victim's condition was relevant to prove that the defendants attempted an intentional, premeditated, and deliberate killing. The trial court found that a savage beating, as shown by the victim's condition, would be relevant to show intent. With respect to causation, the trial court found that it was within the jury's province to determine if the victim's condition was caused by the beating. The trial court ruled that the victim's mother could not make a medical diagnosis or give speculative testimony, but she could testify to what she observed.

During the direct examination of the victim's mother, the following occurred:

> [PROSECUTOR]: Have you noticed any physical changes in your son since he was released from the hospital?
>
> [WITNESS]: Yes, sir.
>
> [PROSECUTOR]: All right. Could you describe those physical changes.
>
> [WITNESS]: His physical changes, he doesn't walk or talk the way he did before.
>
> [PROSECUTOR]: All right. Did your son have a speech impairment before April 14, 1994?
>
> [WITNESS]: No, sir.

10

[PROSECUTOR]: Did he walk abnormally before April 14, 1994?

[WITNESS]: No, sir.

[PROSECUTOR]: Have you noticed any changes in your son's personality since April 14, 1994?

[DEFENSE COUNSEL]: Object again, Judge.

THE COURT: All right. Well, I'm going to allow it if she can tell what she observed.

[PROSECUTOR]: Yes.

[DEFENSE COUNSEL]: All right, sir.

THE COURT: Not what his thoughts are or what he says, but any changes that you saw, please.

[PROSECUTOR]: I can rephrase the question, Your Honor.

[PROSECUTOR]: Have you observed any changes in your son's behavior since April 14, 1994?

[WITNESS]: Yes, sir.

[PROSECUTOR]: Could you tell us what you have observed.

[WITNESS]: I've observed him--his mental capabilities are not the same, and his physical attributes are not the same; and he's restless a lot and sleep impairments like walking all the time.

[PROSECUTOR]: All right. Is your son able to do mechanic work on cars now?

[WITNESS]: No, sir.

[PROSECUTOR]: Does he try to do mechanic work?

[WITNESS]: Sometimes he tries.

[PROSECUTOR]: And what happens when he tries, if you know?

[WITNESS]: He mess up [sic].

The defendants contend that the victim's mother gave opinions as to her son's condition that she was not qualified to give. Initially, we note that the opinion

11

testimony of lay witnesses is governed by Tenn. R. Evid. 701, which states the following:

> (a) Generally. If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) rationally based on the perception of the witness and
>
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

In State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), a police officer testified that a bloody T-shirt found around the victim's neck had been used as a gag. Our supreme court held that the testimony was an inadmissible lay opinion and stated:

> A non-expert must ordinarily confine his testimony to a narration of facts based on first-hand knowledge and avoid stating mere personal opinions. Blackburn v. Murphy, 737 S.W.2d 529, 531 (Tenn. 1987). The purpose of this rule is "to preserve the primary fact-finding role of the jury, since '[i]t is the function of the witness to state evidentiary facts and the function of the jury to draw such conclusions as the facts warrant.'" Id. (quoting Wilson v. Nashville, Chattanooga & St. Louis Ry., 16 Tenn. App. 695, 705, 65 S.W.2d 637, 643 (1933)).
>
> Nevertheless, there are exceptions to the general rule. "Non-expert opinion testimony can be admissible when 'such testimony describes observed facts in the only way in which they can be clearly described.'" Id., 737 S.W.2d at 532 (quoting National Life & Accident Ins. Co. v. Follett, 168 Tenn. 647, 662, 80 S.W.2d 92, 98 (1935)). Therefore, admissible lay opinion testimony is limited to those circumstances
>
>> [w]here facts perceived by the senses are numerous, and it is difficult to describe them adequately to the jury, and the conclusion or inference to be drawn from such facts is simple and within the range of common experience, and the witness can relate what he has seen more accurately and more easily by stating his conclusion than by attempting to detail the [evidentiary] facts.

Id. at 330-31. Although the court stated that the question of admissibility of the testimony was close, it concluded that it would be harmless error even if it were inadmissible. The court explained that because the defendant had admitted to gagging the victim, the officer's testimony was harmless. Id. at 331.

12

We view the opinion testimony in the present case to be the type permitted by Tenn. R. Evid. 701 as described in Middlebrooks. The victim's mother testified that her son's mental capabilities and physical abilities had changed and that her son could no longer work on cars. These opinions were based on extensive close contact with her son. Her conclusions were within the range of common experience and could best be expressed as an opinion rather than recounting the myriad details on which they were based.

As for causation, we acknowledge that experts are often needed to explain how the injuries they treat are caused by the event in question. This is not necessarily so, though, when the evidence otherwise shows a sufficient connection. See, e.g., McCord v. State, 198 Tenn. 226, 230-31, 278 S.W.2d 689, 691 (1955) (holding that the cause of death need not be proven by expert testimony when defendant's act is proven, the wounds are apparent, and there is no suggestion of another cause); Bryant v. State, 503 S.W.2d 955, 958 (Tenn. Crim. App. 1973). We believe that there was sufficient evidence presented from which the jury could rationally conclude that the victim's mental and physical problems that existed after the beating resulted from that beating.

In this case, the state had to prove that the defendants attempted an intentional or knowing killing. The severity of the beating was relevant to show that they attempted to kill the victim, either intentionally or knowingly. Just as the state could introduce evidence showing that the defendants beat the victim in a violent manner by stomping on his head, it could also introduce evidence showing that the results of the beating were severe. The testimony of the victim's condition was not unfairly prejudicial.

### III. ADMISSIBILITY OF PHOTOGRAPHS

13

The defendants contend that the trial court erred by admitting into evidence the photographs used to identify the defendants because the photographs were unfairly prejudicial with little probative value. They argue that the photographs were inherently prejudicial because they were mug shots taken when the defendants were arrested. The state responds that the photographs were relevant to prove the identity of the defendants, and the photographs' potential prejudicial effect did not substantially outweigh their probative value. We agree.

The defendants' photographs were included in a photographic array of five pictures. Each photograph consisted of an individual's front view and profile and included a placard showing that the photograph was taken for the Shelby County Justice Complex. The placard identified the individual by a booking number and date. After the defendants' objection, the state blackened the booking numbers and dates on each picture.

The admissibility of photographs is a matter left to the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent a clear abuse of discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); see also State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); State v. Evans, 838 S.W.2d 185, 193 (Tenn. 1992); State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995). Nevertheless, the photographs must be relevant to an issue at trial, and the danger of unfair prejudice must not substantially outweigh their probative value. Tenn. R. Evid. 403; see Banks, 564 S.W.2d at 951.

The state must prove beyond a reasonable doubt that the accused is the person who committed the offense. See White v. State, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975). The identity of the accused, as with any other element of a crime, is a question of fact for the determination of the jury after consideration of all competent

14

evidence.  See Biggers v. State, 411 S.W.2d 696, 697 (Tenn. 1967), cert. granted, 390 U.S. 404, 88 S. Ct. 979 (1968) (affirmed on other grounds); State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).  Because the state's witnesses, Petties and Parks, knew Cavil only as Cap, the photographs were relevant to the witnesses' pretrial identification of Cavil.

The photographs used for the pretrial identification were poorly masked and did not conceal from the jury that the photographs were police mug shots.  In State v. Washington, 658 S.W.2d 144 (Tenn. Crim. App. 1983), the state introduced as evidence a mug shot of the defendant showing a booking date.  Id. at 146.  The court determined that a photograph showing that the defendant had been arrested, by itself, was not sufficient to lead to an inference of previous criminal activity by the accused.  Id.  Because the photographs in Washington bore the date of the offense on trial, the possibility of inferring prior criminal activity from the photographs did not exist.  Id.

However, in this case, the defendants requested that the dates and booking numbers on the photographs be blackened.  If the dates had remained on the photographs, they would be no more prejudicial than the photographs found admissible in Washington.  Even with the dates blackened, we conclude the trial court did not abuse its discretion in finding that the photographs were relevant to the issue of identification and that the probative value of the photographs outweighed any prejudicial effect.

15

## IV. CROSS-EXAMINATION OF GEORGE PETTIES

The defendants contend that the trial court erred by refusing to allow them to cross-examine George Petties. The defendants argue that they should have been permitted to question Petties about where he sat in the police car when he was picked up for questioning. The state responds that where Petties sat in the police car was not relevant.

During cross-examination by Graham's attorney, Petties testified that Sergeant Thweat came to his house and took him to the police station for questioning. Petties said that he rode in the police car. When asked if he sat in the front seat, the state objected on relevancy grounds. In a bench conference, Graham's attorney stated that he was attempting to show that the witness was a suspect in this case because the witness did not sit in the front seat of the police car and therefore, had a motive to accuse Graham. The trial court considered the inference sought by Graham from Petties' position in the police car to be "kind of reaching" and sustained the state's objection.

The cross-examination of Petties resumed and the following transpired:

[DEFENSE COUNSEL]: Without telling me where in the car that you were seated, tell us how long it took you to have the police drive you from your house to the police station.

[PROSECUTOR]: I'm going to object, Your Honor. The objection is the same. The relevancy of these car trips -- it's irrelevant.

THE COURT: All right. I don't think it's relevant, [defense counsel]. I'm not going to allow that.

The admissibility of evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992). In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence

16

of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In other words, evidence is relevant if it helps the jury resolve a factual issue.

The defendants sought to impeach the witness's credibility by raising an inference that the witness was a suspect and had a motive for accusing the defendants. However, in this case, the defendants had no knowledge or proof that the witness was a suspect in the case and only hoped to raise the inference by showing that the witness rode in the backseat of the police car when taken to the police station for questioning. We conclude that this testimony would have little or no probative value in establishing improper motive and that the trial court did not abuse its discretion by limiting the questioning.

## V. PARKS' PRIOR CONVICTION

The defendants contend that the trial court erred by refusing to allow them to cross-examine K.C. Parks about a prior misdemeanor conviction for criminal attempt. First, they argue that the witness committed a crime that involved moral turpitude, allowing for impeachment. Second, they argue that the Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees them the right to cross-examine witnesses against them. The defendants assert that without complete cross-examination, the jury could not properly assess the witness's credibility. The state responds that evidence of Parks' prior conviction was barred by Tenn. R. Evid. 609(a)(2), because the defendant did not show that the conviction involved dishonesty or false statement.

After Parks testified on direct examination, counsel for Graham attempted to impeach Parks with evidence of a prior conviction. Before starting his cross-examination of Parks, defense counsel showed the trial court a printout indicating that

17

Parks had pled guilty to an "attempt misdemeanor." Defense counsel stated that the crime attempted was the felony of altering and falsifying license plates, a Class E felony. See T.C.A. § 55-5-116. The trial court noted that the documents did not indicate what crime Parks attempted and that without proof that the misdemeanor involved moral turpitude, the conviction could not be used for impeachment.

While Graham's attorney continued cross-examination, additional information on the conviction was retrieved from the courthouse. The new information only showed that the conviction was for an "attempt misdemeanor." The trial court stated that a "criminal attempt misdemeanor is not criminal attempt altering or forging a plate" because that crime is "criminal attempt felony." The trial court ruled that the prior conviction could not be used because the trial court could not determine to which misdemeanor Parks pled.

Initially, we note that defense counsel requested that the trial court mark the documents retrieved for identification purposes. The record for review does not contain this exhibit, even though it is listed in the index as being part of the record. The state's brief notes that the exhibit is missing from the record. It is the defendants' duty "to have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to the issues that are the bases of appeal." T.R.A.P. 24(b). When necessary parts of the record are not included on appeal, this court must presume that the trial court's ruling was correct. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Such is the case before us. However, we will review the merits of the defendants' issue upon the record before us.

The credibility of a witness may be attacked by presenting evidence of a prior conviction for either a felony or a misdemeanor involving dishonesty or false

statement. Tenn. R. Evid. 609(a)(2). The issue before us also involves the core interest secured by the defendants' constitutional right to confront the witnesses against them, i.e., cross-examination.

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness.

Davis v. Alaska, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110, (1974). However, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." State v. Reid, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

The trial court found that the witness had pled guilty to an "attempt misdemeanor" and that the defendants offered no proof of the underlying crime which the witness attempted. The trial court noted that if the underlying crime had been altering or falsifying license plates, a Class E felony, attempt would be one classification lower, a Class A misdemeanor, and properly called an attempted felony. See T.C.A. §§ 55-5-116, 39-12-107. The trial court ruled that the conviction was inadmissible because it could not determine the offense the witness had committed. The evidence only showed that the witness was convicted of a misdemeanor without any indication that it involved dishonesty or false statement. Without such a showing, evidence of the conviction was not admissible under Rule 609. Considering the circumstances of this

19

case, we conclude that under Tenn. R. Evid. 609, the trial court did not err in ruling that the evidence of the conviction was not admissible.

## VI.  JURY INSTRUCTION ON REASONABLE DOUBT

Both defendants contend that the trial court improperly instructed the jury on the burden of proof because it did not instruct the jury that the state had the burden of proving the defendants' guilt to a moral certainty.  The trial court gave the following reasonable doubt instruction:

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.
>
> It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.
>
> A reasonable doubt is just that -- a doubt that is reasonable after an examination of all the facts of this case.
>
> If you find the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

See T.P.I.-Crim. 2.03(a) (4th ed.).  The defendants did not submit a requested instruction or object to this instruction at trial, although they did raise the issue in their motion for new trial.  The state contends that this issue requires a plain error review because the defendants did not request a different instruction or object to the instruction at trial.  The state also contends that there is precedent for allowing reasonable doubt instructions such as the one at issue here.

Pursuant to Rule 30(b), Tenn. R. Crim. P., the failure to object to the content of an instruction given at trial does not bar raising the issue as error in support of a motion for new trial.  Because the defendants raised the issue during their motion for a new trial, the issue is properly before us.

This court has previously examined nearly identical instructions concerning reasonable doubt. See State v. Henning, No. 02C01-9703-CC-00126, Madison County (Tenn. Crim. App. Oct. 24, 1997) (holding that the pattern jury instruction was not constitutionally deficient and that it sufficiently instructed the jury); State v. Derek Denton, No. 02C01-9409-CR-00186, Shelby County (Tenn. Crim. App. Aug. 2, 1996) (concluding that the jury instruction concerning reasonable doubt did not constitute reversible error). The instruction given in the present case was, likewise, adequate.

## VII. FAILURE TO CHARGE ASSAULT AND AGGRAVATED ASSAULT

The defendants contend that the jury should have been charged with the offenses of assault and aggravated assault. They argue that assault and aggravated assault are lesser included offenses of attempted first degree murder. In his reply brief, Cavil asserts that the state overcharged him and violated due process. The state responds that assault and aggravated assault are not lesser included offenses of attempted first degree murder. We agree.

In State v. Trusty, 919 S.W.2d 395 (Tenn. 1996), the defendant was convicted of aggravated assault on an indictment for attempt to commit first degree murder. Id. at 307. In reversing the conviction, our supreme court held that defendants are entitled to jury instructions on all lesser included offenses and on all lesser grades or classes of the offense charged if the evidence would support a conviction for the offense. Id. at 311. The Trusty court held that aggravated assault was neither a lesser included offense nor a lesser grade of the offense of attempt to commit first degree murder. Id. at 312. For similar reasons, we conclude that assault is not a lesser included offense or lesser grade of attempted murder.

21

Defendant Cavil contends that he was charged with a greater offense than he committed in violation of his due process rights. He argues that if this were not a case of self-defense, it would only be one of assault or aggravated assault. As previously discussed, the evidence was sufficient to convict Cavil of attempt to commit second degree murder. We conclude that his due process rights were not violated.

## VIII. JURY CHARGE REGARDING RANGES OF PUNISHMENT

Both defendants contend that the trial court erred by not charging the jury with the total range of punishment for the charged offenses. The defendants argue that the Range II penalties should have been charged along with the Range I penalties. The state responds that the trial court properly charged the jury as to the sentencing ranges for the charged offenses. The state asserts that there was no error because the trial court charged on the sentences of Range I, and the defendants were sentenced in Range I. We agree.

In State v. Lawson, 695 S.W.2d 202 (Tenn. Crim. App. 1985), this court held that the trial court did not commit reversible error when it instructed the jury on the complete range of punishment available upon conviction. Id. at 204. The defendant argued that only the Range II punishment should have been charged because he was a Range II offender. Id. The Lawson court stated that T.C.A. § 40-35-201(b) requires the trial court to "charge the possible penalties for the offense charged and all lesser included offenses." Id.

In State v. Robinson, 930 S.W.2d 78 (Tenn. Crim. App. 1995), the defendant was convicted of first degree murder and arson. The trial court charged the jury with only the Range I punishment. Even though the state had not filed a notice of its intention to seek enhanced punishment, the defendant contended that the trial court erred by failing to charge the complete range of punishment. This court held that it was

22

not prejudicial error to limit the instructions to the range of punishment that actually could be imposed because juries would be properly apprised of the actual punishment that would result from a guilty verdict. Id. at 84.

In the present case, the trial court noted that the state had not filed any notice for enhanced range punishment. Absent such a notice from the state, the trial court is limited to Range I sentencing. See T.C.A. § 40-35-210. The trial court instructed the jury on the proper Range I sentences for the offenses charged. We conclude under Robinson that instructing the jury on the sentences available to a Range I offender was not prejudicial error.

## IX. CAVIL'S SENTENCING

Defendant Cavil contends that the sentence imposed was excessive and that the trial court did not properly consider the enhancement and mitigating factors. He claims that the trial court should not have applied enhancement factor (2), that he was the leader in the commission of the offense, because there was no factual basis to support a finding that he was the leader. He claims that enhancement factor (6), that the personal injuries of the victim were particularly great, should not have been applied because the hospital discharged the victim in excellent condition. He also claims that the court should have applied mitigating factor (2), that he acted under strong provocation, because the evidence showed that he was provoked. The state responds that the trial court properly applied the enhancement and mitigating factors. We agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately

23

supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The sentence to be imposed by the trial court is presumptively the minimum in the range unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as

appropriate for any mitigating factors. T.C.A. § 40-35-210(d) and (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

At the sentencing hearing, Graham testified about starting his security service and described Cavil as being instrumental in helping him get the business started. Graham testified that Cavil was in charge of the private detective division of his security service.

Victor Thayer, the chief investigator for the Kroger Company in Memphis, testified that he had a good working relationship with both defendants. He said that his company employed Graham's company and that he often met with both defendants throughout his almost two-year relationship with them. Mr. Thayer described both defendants as gentlemen.

Defendant Cavil testified that while in the Army, he received a fifteen-day restriction for being absent without leave. He testified that he had been charged three times for contempt of Juvenile Court because he had failed to pay child support. He admitted that he had filed for Chapter 13 bankruptcy and was having financial difficulties.

Ben Hale of Promus Companies testified that his company employed Cavil for almost four years as a security officer. Mr. Hale stated that he was very impressed with Cavil and found him to be an exemplary employee. Patrolman Boldt of the Memphis Police Department testified that he had a professional relationship with Cavil for the past two years. He stated that as a patrol officer, he had contact with Cavil

while he was working as a security officer. He said that he always found Cavil to be very civil and professional.

At the conclusion of the sentencing hearing, the trial court found that Graham had one prior conviction. The trial court found two enhancement factors and no mitigating factors. Graham was sentenced as a Range I, standard offender to three years in the local workhouse. The trial court noted that Graham had excellent character, was a college graduate and had his own business, employing thirty people. The trial court fined him one thousand dollars and placed him on immediate probation for three years.

The trial court sentenced Cavil as a Range I, standard offender to nine years in the custody of the Department of Correction and fined him one thousand five hundred dollars. The trial court applied the following enhancement factors as listed in T.C.A. § 40-35-114:

> (2) the defendant was a leader in the commission of an offense involving two (2) or more criminal actors;
>
> (6) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great.

With respect to enhancement factor (2), the trial court found that Cavil, even though an employee of Graham, had a greater role in the offense and acted as a leader in the offense. With respect to enhancement factor (6), the trial court found that the victim suffered particularly great personal injuries and noted that the injuries included the permanent loss of the victim's lifestyle, and a loss of cognitive, motor and speech skills. The trial court noted that the injuries that it considered were not the same injuries that the jury heard and considered in determining guilt.

26

The trial court stated that no mitigating factors applied. The trial court found that Cavil was not a suitable candidate for probation. The trial court noted that unlike Graham, Cavil had problems in the military and had trouble meeting his obligations as shown by his arrests for failure to pay child support and his filing for bankruptcy.

Defendant Cavil contends that there was no factual basis for the application of enhancement factor (2), that he was a leader in the commission of the offense. On the contrary, the evidence at trial shows that Cavil instigated the fight and continued to beat the victim after he had fallen to the ground. The evidence also shows that Graham participated, but to a lesser degree. Graham struck the victim and kicked him with the side of his foot, whereas Cavil jumped on the victim's head until blood flowed from his mouth. We conclude that Cavil acted as a leader in the commission of the offense.

Defendant Cavil also contends that enhancement factor (6), that the victim suffered particularly great injuries, does not apply because the victim was released from the hospital in excellent condition. The evidence at trial shows that the victim continued to suffer speech impairment and walking difficulties. The trial court found that the victim suffered permanent disabilities. The evidence sufficiently supports the application of this enhancement factor.

As for Cavil's argument with respect to the trial court's decision that no mitigating factors applied, we believe that the evidence supports the trial court's decision. He argues that he acted under strong provocation and that this factor should have mitigated his sentence. Credible testimony reflects that Cavil was the first to strike without provocation. The only testimony to the contrary was his. He also argues that he provided ample evidence of his good character. However, the trial court noted that

aside from the character witnesses' testimony, Cavil had trouble with the military, his marriages, and meeting his financial and legal obligations.

The weight to be given to enhancement and mitigating factors is left to the trial court's discretion. State v. Marshall, 888 S.W.2d 786, 788 (Tenn. Crim. App. 1994). We conclude that the trial court properly sentenced Cavil.

Finally, Cavil claims that his sentence was unfair in light of that received by Graham. The jury convicted Cavil of attempt to commit second degree murder and Graham of attempt to commit voluntary manslaughter. The Sentencing Reform Act of 1989 mandates sentencing guidelines for the various classifications of offenses. See T.C.A. § 40-35-111. This claim is without merit because the defendants were convicted of different offenses, and each defendant's case requires individual consideration.

In consideration of the foregoing and the record as a whole, the trial court's judgment of conviction is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Joe B. Jones, Presiding Judge[1]

_____
Jerry L. Smith, Judge

---

[1] Judge Joe B. Jones died May 1, 1998, and did not participate in this opinion. We acknowledge his faithful service to this court, both as a member of the court and as its Presiding Judge.

28